IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 20-cv-03531-PAB-SKC

MCLAUGHLIN GROUP, INC., a South Carolina corporation, and
VAC-TRON EQUIPMENT, LLC, a Delaware limited liability company,

    Plaintiffs and Counterclaim Defendants,

v.

VAC-TRON HOLDINGS, INC., a Delaware corporation,
AMERICAN MANUFACTURING & MACHINE, INC., a Florida corporation, and
REPUBLIC FINANCIAL CORPORATION, a Colorado corporation,

    Defendants and Counterclaim Plaintiffs.

---

# ORDER

---

This matter is before the Court on Plaintiffs/ Counter-Defendants' Motion to Dismiss American Manufacturing & Machine, Inc.'s First Amended Counterclaim Against Vac-Tron Equipment LLC [ECF 99] [Docket No. 101]. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**I. BACKGROUND**[1]

Republic Financial Corporation ("Republic Financial") is a venture capital firm that invests in small to mid-size manufacturing, distribution, and industrial companies. *Id.* at 3, ¶ 4. Vac-Tron Equipment, LLC ("Vac-Tron Equipment") manufactures and sells commercial excavation vacuum equipment. *Id.*, ¶ 5.

---

[1] The Court assumes that the allegations in Defendant American Manufacturing & Machine, Inc.'s Crossclaim Against Defendant Republic Financial Corporation and First Amended Counterclaim Against Vac-Tron Equipment LLC [Docket No. 99] are true in considering this motion to dismiss. *Cf. Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

In 2008, Republic Financial acquired 63% of Vac-Tron Equipment. *Id.*, ¶ 6. With its majority interest, Republic Financial had the power to appoint two of the three managers of Vac-Tron Equipment and to sell, lease, or exchange Vac-Tron Equipment's assets. *Id.*, ¶ 7. American Manufacturing & Machine, Inc. ("AMM") believes that Republic Financial formed Vac-Tron Holdings, Inc. ("Vac-Tron Holdings") to hold Republic Financial's interest in Vac-Tron Equipment and that Vac-Tron Holdings was a wholly owned subsidiary of Republic Financial. *Id.*, ¶ 6.

Don Buckner,[2] AMM's president, founded Vac-Tron Equipment. *Id.* at 3–4, ¶ 8. After Republic Financial acquired the majority interest in Vac-Tron Equipment, AMM owned 28% of Vac-Tron Equipment. *Id.* Mr. Buckner had an active role in the company until he resigned as president in 2015, after which he continued to serve on the board of directors, but was not involved in day-to-day operations. *Id.* at 4, ¶ 9.

After Mr. Buckner resigned, Republic Financial appointed Tim Fischer[3] to be president of Vac-Tron Equipment. *Id.*, ¶ 10. Mr. Fischer was responsible for operating Vac-Tron Equipment, including communicating with its members about the company and the members' interests. *Id.* Before becoming president of Vac-Tron Equipment, Mr. Fischer was senior managing director of Republic Financial and was responsible for Vac-Tron Equipment and other companies that Republic Financial invested in. *Id.*, ¶ 11. In early 2016, Mr. Fischer also became a manager of Vac-Tron Equipment and a

---

[2] Plaintiffs dismissed their claims against Mr. Buckner on February 24, 2021. Docket Nos. 59, 60.

[3] Plaintiffs dismissed their claims against Mr. Fischer on December 23, 2020. Docket Nos. 21, 26.

member of the board of directors. *Id.* Mr. Fischer regularly communicated with the members of Vac-Tron Equipment, including AMM, about the business, and AMM relied on Mr. Fischer to provide it with accurate and complete information. *Id.*, ¶ 12.

With Mr. Fischer as president, Republic Financial took steps to sell Vac-Tron Equipment. *Id.* at 5, ¶ 13. Lumos Partners ("Lumos"), an investment bank, met with Robert Possehl,[4] president of Republic Financial, and other Republic Financial leaders to discuss the services that Lumos could provide if retained as the financial advisor for Vac-Tron Equipment's sale. *Id.*, ¶ 14.

Lumos then negotiated an engagement agreement with Republic Financial through Mr. Possehl and Republic Financial's CEO and general counsel. *Id.*, ¶ 15. Lumos addressed the agreement to Mr. Possehl and revised the agreement based on his comments. *Id.*, ¶ 16. The agreement called for Vac-Tron Equipment to pay Lumos a non-refundable cash retainer of $40,000 and an additional fee if Lumos ultimately arranged the sale of Vac-Tron Equipment. *Id.* at 5–6, ¶ 17. AMM, which was not involved in negotiating the agreement, believes that Mr. Fischer signed the agreement on November 18, 2016 as the manager of Vac-Tron Equipment. *Id.* at 5–6, ¶¶ 16, 18. The final version of the agreement with Lumos provided that both parties had the option to terminate the agreement without cause. *Id.*, ¶ 19. The agreement provided, in relevant part:

> The term of this Agreement (the "Term") will begin on the date hereof and continue until this Agreement is terminated pursuant to this Section 4. Either party shall have the right to terminate this Agreement upon 30 days

---

[4] Plaintiffs dismissed their claims against Mr. Possehl on November 30, 2021. Docket Nos. 113, 116.

>   written notice to the other party; provided, however, that no party may
>   deliver such a written notice of termination to the other party under this
>   sentence prior to 30 days from the date hereof.  However, if the Company
>   consummates a Transaction with any potential buyer who has signed an
>   NDA prior to date [sic] that is 12 months following the date of termination
>   by the Company, Lumos Partners will be entitled to the full Transaction
>   Fee.

*Id.*

After Vac-Tron Equipment signed the agreement, Lumos and Republic Financial held weekly telephone calls for Lumos to report on its efforts to sell Vac-Tron Equipment.  *Id.* at 7, ¶ 21.  Mr. Fischer and Mr. Possehl were on these calls.  *Id.*

AMM and Mr. Buckner were not involved in the day-to-day communications with Lumos or the review of Lumos's progress.  *Id.*, ¶ 23.  AMM relied on Mr. Fischer and Mr. Possehl to manage Lumos's efforts to sell Vac-Tron Equipment and placed trust and confidence in Republic Financial's "retention, control[,] and management of Lumos."  *Id.*

Mr. Fischer and Mr. Possehl were not satisfied with Lumos's efforts.  *Id.*, ¶ 22.  In November 2017, Mr. Possehl told Mr. Fischer that Republic Financial would "like to stop the process" with Lumos, and Mr. Fischer informed Lumos the same day to "'stop the process' because nothing good would come from an 'ongoing process in the market.'" *Id.*, ¶ 24.  Mr. Fischer told Lumos that he would revisit efforts to sell Vac-Tron Equipment in the new year.  *Id.*  Mr. Fischer and Mr. Possehl took the position that the contract with Lumos had been terminated.  *Id.* at 8, ¶ 25.  AMM was not consulted in the decision to stop Lumos's efforts.  *Id.* at 7, ¶ 24.  Mr. Fischer also told Mr. Buckner at AMM that the Lumos engagement had been cancelled, and AMM had no reason to question this representation because, in AMM's view, Republic Financial was the

majority owner of Vac-Tron Equipment, had decided to retain Lumos, and could decide to terminate Lumos.  *Id.* at 8, ¶ 28.

In spring 2018, Vermeer Corporation ("Vermeer") approached Vac-Tron Equipment about purchasing the company.  *Id.*, ¶ 26.  On July 6, 2018, Vermeer and Vac-Tron Equipment signed a "Confidentiality and Nondisclosure Agreement" (the "NDA").  *Id.*  AMM considers this to be a "significant" development because Vac-Tron Equipment's agreement with Lumos provided Lumos its full transaction fee if Vac-Tron Equipment "consummated a transaction with a potential buyer who had signed a non-disclosure agreement 'prior to date that is 12 months following the date of termination by' Vac-Tron Equipment."  *Id.*  Vermeer did not sign the confidentiality agreement until months after Republic Financial had decided to terminate Lumos, and AMM believes that Republic Financial could have terminated the agreement with Lumos in late 2017 or 2018 without any liability to Lumos in connection with the sale to Vermeer.  *Id.*, ¶ 27.  Mr. Fischer advised Mr. Buckner that the agreement with Lumos was terminated after Vermeer and Vac-Tron Equipment signed the NDA and while Vermeer was conducting due diligence in connection with the sale of Vac-Tron Equipment.  *Id.* at 9, ¶ 30.

In November 2018, the members of Vac-Tron Equipment, including AMM and Vac-Tron Holdings, entered into an agreement with McLaughlin Group, Inc. ("McLaughlin"), which is a wholly owned subsidiary of Vermeer, under which the members of Vac-Tron Equipment sold their interests to McLaughlin.  *Id.*, ¶ 31.  During these negotiations, neither Republic Financial nor Vac-Tron Equipment advised AMM that the Lumos agreement had not been terminated.  *Id.*  Vac-Tron Equipment had a pecuniary interest in the sale of its membership interests to McLaughlin because,

5

among other things, Mr. Fischer had signed the Lumos agreement on behalf of Vac-Tron Equipment, and Vac-Tron Equipment was potentially liable to Lumos based on the sale to McLaughlin. *Id.*, ¶ 32. In addition, AMM believes that the sale had the potential to have a long-term impact on the financial viability of Vac-Tron Equipment. *Id.*

The McLaughlin purchase agreement acknowledged the role that Republic Financial played in the negotiations for the purchase of Vac-Tron Equipment. *Id.* at 10, ¶ 33. Under the agreement, each seller, including AMM, appointed Republic Financial as the agent of the sellers to "take any action (1) to give or receive notice; (2) to receive and distribute any funds received; (3) to resolve any disputes; (4) to enter any settlement; and (5) to engage attorneys and other professionals." *Id.* The purchase agreement also included a provision that "required AMM and the other members of Vac-Tron Equipment to warrant that there were no brokers . . . that would be owed any commission in connection with the sale of the membership interests." *Id.*, ¶ 34.

AMM signed the agreement with the alleged warranty in reliance on Mr. Fischer's indication that the agreement with Lumos had been terminated. *Id.* If AMM had known that Mr. Fischer and Mr. Possehl had not terminated the agreement with Lumos, AMM believes that it could have tried to avoid liability in connection with the Lumos agreement by, among other things, encouraging Vac-Tron Equipment to terminate the Lumos agreement before entering into the NDA with Vermeer or encouraging the other members of Vac-Tron Equipment to negotiate a resolution of Lumos's claim before agreeing to sell their membership interests. *Id.*, ¶ 35.

AMM believes that, after the sale to McLaughlin, Lumos filed an arbitration proceeding against Vac-Tron Equipment to recover the transaction fee that it claimed to

6

have earned based on the sale to McLaughlin. *Id.* at 11, ¶ 36. AMM also believes that Republic Financial "provided the defense for the arbitration," and Vac-Tron Equipment defended by arguing that the engagement with Lumos had been terminated. *Id.* Neither Republic Financial, nor Mr. Fischer, nor Mr. Possehl consulted with AMM on how to respond to the arbitration, but instead retained counsel to dispute Lumos's allegations. *Id.*, ¶ 37

On November 16, 2020, an arbitrator entered an award for Lumos, which AMM believes Vac-Tron Equipment and McLaughlin allegedly paid. *Id.*, ¶ 38. AMM believes that, by entering an award for Lumos, the arbitrator implicitly rejected Mr. Possehl and Mr. Fischer's argument that the agreement with Lumos had been terminated when Mr. Fischer emailed Lumos to "stop the process." *Id.*

McLaughlin and Vac-Tron Equipment filed this lawsuit to recover from the members of Vac-Tron Equipment the amount of money that it paid Lumos. *Id.*, ¶ 39. AMM brings a cross-claim against Republic Financial for a breach of fiduciary duty, *id.* at 11–13, ¶¶ 40–46, and a counterclaim against Vac-Tron Equipment for negligent misrepresentation. *Id.* at 13–14, ¶¶ 47–54. Both Republic Financial, Docket No. 100, and Vac-Tron Equipment, Docket No. 101, move to dismiss these claims.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting Twombly, 550 U.S. at 555) (alterations omitted). However, a plaintiff still must provide "supporting factual averments" with her allegations. *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009) ("[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." (citation omitted)). Otherwise, the Court need not accept conclusory allegations. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at

1286 (alterations omitted).

## III. ANALYSIS

### A. Choice of Law

As an initial matter, Vac-Tron Equipment argues that Florida law applies to this dispute. Docket No. 101 at 6–7. In a diversity case, a federal court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941); *Morris v. Travelers Indem. Co. of Am.*, 518 F.3d 755, 758 (10th Cir. 2008) ("In diversity cases, the laws of the forum state govern our analysis of the underlying claims."). However, a court should not engage in a choice-of-law analysis unless the choice of law would be dispositive. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 839 n.20 (1985) ("If the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them."); *see also Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) ("According to conflicts of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question.").

AMM is correct that both Colorado and Florida apply the Restatement (Second) of Torts § 552(1) in analyzing negligent misrepresentation claims. *See, e.g.*, *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 72 (Colo. 1991) ("we conclude that the definition of negligent misrepresentation contained in section 552(1) is persuasive and controls the resolution of the legal issues presented in this case"); *Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, N.A.*, 892 P.2d 230, 236 (Colo. 1995) ("We

have defined 'negligent misrepresentation' according to section 552 of the Restatement (Second) of Torts."); *M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 93–94 (Fla. 2002) ("this Court held that one may be held liable for negligent misrepresentation when the recipient of the misstatement is able to establish the cause of action as set forth in section 552 of the Restatement (Second) of Torts"); *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 335 (Fla. 1997) ("the party who negligently transmitted the false information may be held liable when the recipient is able to establish a negligent misrepresentation cause of action as set forth in the Restatement (Second) of Torts section 552"). Because the negligent misrepresentation analysis would be the same under both Colorado and Florida law, as both states apply the Restatement, the Court need not, and does not, conduct a choice-of-law analysis. *See Phillips Petroleum*, 472 U.S. at 839 n.20.

### B.  Negligent Misrepresentation Claim

To plead a negligent misrepresentation claim, AMM must plausibly allege that, (1) in the course of a business, profession, or employment, or in any transaction in which Vac-Tron Equipment had a pecuniary interest, (2) Vac-Tron Equipment supplied false information (3) for the guidance of AMM in its business transactions (4) causing AMM pecuniary loss; (5) AMM justifiably relied on the information, and (6) Vac-Tron Equipment failed to exercise reasonable care or competence in supplying the information. Restatement (Second) of Torts § 552(1).[5]

---

[5] The parties dispute whether Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies in negligent misrepresentation cases. *See* Docket No. 101 at 5; Docket No. 103 at 4–5. Courts in this District appear to be split. *Compare Butera v. Crane*, No. 13-cv-03327-RBJ, 2014 WL 5849317, at *9 (D. Colo. Nov. 12, 2014)

AMM alleges that Mr. Fischer, as president, manager, and director of Vac-Tron Equipment, informed AMM that the agreement with Lumos had been cancelled, but actually gave AMM false information, as the arbitrator concluded that the agreement had not actually been terminated. Docket No. 99 at 13, ¶ 48. Mr. Fischer provided this information in connection with AMM's sale of its interest in Vac-Tron Equipment, and Mr. Fischer knew that AMM would rely on this information. *Id.* at 13–14, ¶¶ 49–52.

The agreement between Lumos and Vac-Tron Equipment, entered into on or about November 18, 2016, states, in relevant part, that, if Vac-Tron Equipment "consummates a Transaction with any potential buyer who has signed an NDA prior to date [sic] that is 12 months following the date of termination by the Company, Lumos Partners will be entitled to the full Transaction Fee." *Id.* at 6, ¶¶ 18–19. The parties refer to this as the "tail period" or "tail provision." *See, e.g.*, Docket No. 101 at 3, 13–14; Docket No. 103 at 13.

The Court first considers Vac-Tron Equipment's challenge that any purported

---

(applying Rule 9(b)), *with AECOM Tech. Servs., Inc. v. Flatiron | AECOM, LLC*, No. 19-cv-2811-WJM- KLM, 2021 WL 698665, at *6 (D. Colo. Feb. 23, 2021) (declining to apply Rule 9(b)); *see also Lynch v. Olympus Am., Inc.*, No. 19-cv-00512-NYW, 2019 WL 2372841, at *4 (D. Colo. June 5, 2019) (comparing *Conrad v. The Educ. Res. Inst.*, 652 F. Supp. 2d 1172, 1183 (D. Colo. 2009) ("Thus, a claim for negligent misrepresentation should not be governed by the pleading standard set forth in Rule 9(b).") and *Denver Health & Hosp. Auth. v. Beverage Distributors Co., LLC*, 843 F. Supp. 2d 1171, 1177 (D. Colo. 2012) ("Rule 9(b) does not apply to the negligent misrepresentation claim before me. The crux of the claim . . . rings not of fraud but negligence."), with *Gunningham v. Standard Fire Ins. Co.*, No. 07-cv-02538-REB-KLM, 2008 WL 4377451, at *2 (D. Colo. 2008) ("I conclude that the particularity requirement is applicable to the negligent misrepresentation claim. In this context, negligence is a type of mistake and Rule 9(b) concerns allegations of fraud or mistake.")) Because AMM's counterclaim fails even under the usual pleading standard, the Court need not decide whether Rule 9(b) applies to negligent misrepresentation claims.

misrepresentation by Mr. Fischer was immaterial because Vac-Tron Equipment entered into the NDA with Vermeer within 12 months after terminating the agreement with Lumos and ultimately consummated the transaction with McLaughlin.  *Id.* at 3, 11–15.[6] Vac-Tron Equipment argues that the terms of the NDA entitled Lumos to the transaction fee regardless of when or whether Mr. Fischer represented to a non-party that the Lumos agreement was terminated.  *Id.*  Thus, Vac-Tron Equipment argues, AMM cannot show that the alleged misrepresentation caused AMM any loss and therefore cannot prove its counterclaim.  The Court agrees.

As the Court has previously noted, AMM alleges that, in November 2017, Mr. Fischer told Lumos "that [Republic Financial] would like to 'stop the process'" and "revisit the efforts to sell the company after the start of the new year."  Docket No. 99 at 7, ¶ 24.  On July 6, 2018, Vermeer and Vac-Tron Equipment signed the NDA.  *Id.* at 8, ¶ 26.  Later, Mr. Fischer told Mr. Buckner that the Lumos agreement had been cancelled or terminated.  *Id.* at 9, ¶ 30.  In November 2018, the members of Vac-Tron Equipment sold their membership interests to McLaughlin, consummating the transaction.  *Id.*, ¶ 31.

Vac-Tron Equipment argues that, "even if AMM had learned that there was no termination of the Lumos Agreement" – i.e., even if Mr. Fischer accurately reported to Mr. Buckner that the Lumos agreement had not been terminated – the fact that the

---

[6] Although Vac-Tron Equipment challenges multiple elements of AMM's negligent misrepresentation claim, Vac-Tron Equipment does not cite the elements as stated in Restatement (Second) of Torts § 552(1).  *See generally* Docket No. 101. Rather, Vac-Tron Equipment relies on elements enumerated in a Florida appellate court decision.  *Id.* at 7 (quoting *Atl. Nat'l Bank of Fla. v. Vest*, 480 So. 2d 1328, 1331 (Fla. Dist. Ct. App. 1985)).

NDA with Vermeer was signed within the 12-month tail period automatically entitled Lumos to its fee if Vac-Tron Equipment consummated the transaction. Docket No. 101 at 14. In response, AMM argues that there is a factual dispute about what the tail provision means that cannot be resolved on a motion to dismiss. Docket No. 103 at 12–13. AMM is mistaken. Interpretation of a contract is a question of law where, as here, the contract's construction does not depend on extrinsic evidence and where the language is susceptible to only one reasonable interpretation. *See Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 332 (10th Cir. 1993); *see also Stegall v. Little Johnson Assoc., Ltd.*, 996 F.2d 1043, 1048 (10th Cir. 1993) (applying Colorado law); *Evensen v. Pubco Petroleum Corp.*, 274 F.2d 866, 872 (10th Cir. 1960). Interpretation of a contract is a question of fact only when a contract term is found to be ambiguous. *See generally Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909 (Colo. 1996). The provisions of a contract are ambiguous when they are subject to more than one reasonable interpretation. *Union Ins. Co. v. Houtz*, 883 P.2d 1057, 1061 (Colo. 1994).

The tail provision is not ambiguous. It states that, if Vac-Tron Equipment consummates a transaction with a buyer that had signed an NDA within 12 months after Vac-Tron Equipment terminated the agreement with Lumos, Lumos would be entitled to its transaction fee. The 12-month tail period began in November 2017, when Vac-Tron Equipment allegedly attempted to terminate – or believed it had terminated – the agreement with Lumos. Because Vac-Tron Equipment and Lumos signed the NDA on July 6, 2018, before the 12-month tail period elapsed, Lumos's entitlement to its fee became automatic once the transaction was consummated. Vac-Tron Equipment, therefore, could have avoided the Lumos fee only if it waited to sign the NDA with

Vermeer until after November 2018, i.e., after the tail period ended; terminated the Lumos agreement before July 6, 2017, so that the tail period elapsed before the NDA was signed; or never consummated the transaction. AMM has not plausibly alleged how Mr. Fischer's representation impacted any of these scenarios and, therefore, how the misrepresentation caused AMM's loss.

The only misrepresentation alleged in the counterclaim is that Mr. Fischer did not accurately represent the state of the Lumos agreement when he told Mr. Buckner that the agreement had been terminated or cancelled. Docket No. 99 at 13–14, ¶¶ 47–54. AMM alleges that this happened after the NDA was signed, but before the deal with McLaughlin was consummated. *Id.* at 9, ¶¶ 30–31. But AMM provides no facts about when it learned of the NDA, and it has not alleged how an accurate representation between July and November 2018 about the state of the Lumos agreement could have delayed the execution of the NDA, or even how the two were related. Similarly, AMM has not alleged how Mr. Fischer's misrepresentation led to signing the NDA during the tail period. Nor has AMM alleged how a misrepresentation made between July and November 2018 could have impacted when the Lumos agreement was terminated, given that, according to AMM, it did not know about the termination until after Mr. Fischer thought he had ended the relationship with Lumos. Of course, a representation in 2018 could not have impacted whether Vac-Tron Equipment – and thus AMM – could have avoided liability to Lumos for the agreement fee by terminating the agreement a year earlier because the termination, or attempted termination, had already occurred by the time AMM learned of it. Therefore, the misrepresentation could only have caused AMM's damages, if at all, if an accurate representation could have prevented

consummation of the transaction with McLaughlin or if the misrepresentation caused consummation, which is what entitled Lumos to its fee after the NDA was signed during the tail period.

AMM argues that there is a factual question about what it could have done if it had learned that the Lumos agreement had not actually been terminated. Docket No. 103 at 13. AMM alleges that, "among other things, [it] could have encouraged Vac-Tron Equipment to terminate the Lumos agreement in accordance with the agreement before Vac-Tron Equipment entered into the [NDA]"or "encouraged or directed Vac-Tron Equipment or other members of Vac-Tron Equipment to negotiate a resolution of Lumos['s] cla[i]m before the members of Vac-Tron Equipment entered into the agreement to sell their membership interests." Docket No. 99 at 10, ¶ 35. But AMM's allegations do not show how AMM could have avoided liability because, beyond its speculative statement that it could have encouraged other members of Vac-Tron Equipment not to sell to McLaughlin (which is not alleged in the counterclaim), AMM provides no allegation that it could have delayed the consummation, especially given that, according to AMM, Republic Financial or Vac-Tron Holdings owned 63% of Vac-Tron Equipment and AMM only owned 28%. *See id.* at 3-4, ¶¶ 7-8. AMM, therefore, could not control when and to whom the sale was consummated, and accordingly, AMM has not plausibly alleged how Mr. Fischer's alleged negligent misrepresentation caused AMM's pecuniary loss.

However, AMM advances another argument for how it could have avoided liability, namely, by controlling who Vac-Tron Equipment sold its interest to. But AMM again fails to connect Mr. Fischer's alleged misrepresentation to this argument. AMM

claims that Lumos "was to be paid only if (a) a potential buyer *from which Lumos secured a non-disclosure agreement* prior to termination (b) consummated a transaction with Vac-Tron Equipment within 12 months of termination." Docket No. 103 at 13 (emphasis added). The portion of the Lumos agreement that AMM excerpted in its counterclaim does not provide any support for the contention that the tail provision only applies to buyers with whom *Lumos* secured a NDA, and AMM provides no other allegation in its counterclaim. The Court cannot consider this allegation in resolving the motion to dismiss. *See Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1566 (10th Cir. 1993) (in reviewing an order granting a motion to dismiss, a court "confin[es] [its] review to the allegations of the complaint"). Alternately, AMM's counterclaim specifically rejects the notion that the relevant time period is between termination of the Lumos agreement and consummation of the transaction with the buyer, as opposed to between termination of the Lumos agreement and execution of the NDA. *See* Docket No. 99 at 8, ¶ 26 (describing Vac-Tron Equipment's signing the NDA with Vermeer as "significant" because the Lumos agreement "stated that Lumos [] was entitled to its full transaction fee if Vac-Tron Equipment consummated a transaction with a potential buyer who had signed a non-disclosure agreement 'prior to date that is 12 months following the date of termination by' Vac-Tron Equipment"). However, as long as the NDA was signed during the tail period, Lumos was entitled to its fee no matter when Vac-Tron Equipment consummated the transaction, so long as the deal went through. *See id*. Therefore, the consummation with McLaughlin within 12 months of Vac-Tron Equipment terminating the agreement with Lumos is irrelevant, given that Vermeer and Vac-Tron Equipment signed the NDA within 12 months of Vac-Tron Equipment's termination of

16

the Lumos agreement.

Because AMM has not plausibly alleged that Mr. Fischer's alleged misrepresentation caused AMM damages, AMM has not plausibly alleged a claim for negligent misrepresentation, and the Court will grant Vac-Tron Equipment's motion to dismiss. The Court does not consider Vac-Tron Equipment's other arguments for dismissal.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiffs/ Counter-Defendants' Motion to Dismiss American Manufacturing & Machine, Inc.'s First Amended Counterclaim Against Vac-Tron Equipment LLC [ECF 99] [Docket No. 101] is **GRANTED**. It is further

**ORDERED** that American Manufacturing & Machine, Inc.'s second claim for relief is **DISMISSED with prejudice**.

DATED March 28, 2022.

BY THE COURT:

_____
PHILIP A. BRIMMER
Chief United States District Judge